(No. 20654.—

HERBERT B. MOWRY *et al.* Appellants, *vs.* THE DEPARTMENT OF PUBLIC WORKS AND BUILDINGS *et al.* Appellees.

*Opinion filed June 18, 1931—Rehearing denied October 9, 1931.*

122

W. T. SUMNER, C. L. CONDER, and G. G. REARDON, for appellants.

OSCAR E. CARLSTROM, Attorney General, (B. L. CA-TRON, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The appellants, who are citizens and tax-payers of Tazewell and Logan counties, filed their bill in the circuit court of Sangamon county to enjoin the Department of Public Works and Buildings from awarding any contract for the construction of a hard-surfaced road on a part of that section of Route 122, in Tazewell county, from Delavan to Hopedale and Minier. The department also located Route 121 from Morton, in Tazewell county, to Hartsburg, in Logan county, and the complainants amended their bill further to enjoin the construction of Route 121 as located between Morton and Hartsburg. Answer and replication thereto were filed, the cause was heard, and a decree was rendered dismissing the bill for want of equity, from which the complainants have appealed.

Routes 121 and 122 are provided for by the Hundred Million Dollars Road Bond Issue act, approved June 29, 1923. (Laws of 1923, p. 512.) Route 121 is described in the act as "Beginning at Peoria and extending in a south-easterly direction to the Indiana State line east of Chrisman, affording Peoria, East Peoria, Morton, Hartsburg (with a suitable connection to Emden) Lincoln, Mt. Pulaski, Marita, Latham, Heman, Warrensburg, Decatur, Antioch, Casner, Tuscola, Newman, Chrisman and the intervening

communities reasonable connections with each other;" and Route 122 is described in the act as "Beginning at Bloomington and extending in a westerly direction to an intersection with Route No. 43 north of Easton (with a suitable connection to San Jose), running along Route No. 24 from a point west of Delavan to a point west of Allen, affording Bloomington, Stanford, Minier, Hopedale, Delavan, San Jose, Allen and the intervening communities reasonable connections with each other."

A map was introduced in evidence, from which it appears that Hartsburg is about twenty-five miles almost due south from Morton. Hopedale is about half-way between the two and about two miles east of the north and south line between them. Delavan is six miles west and three miles south of Hopedale. Emden is two miles north of Hartsburg and one mile west of the west location of the line from Morton to Hartsburg. Route 121 south from Morton to Hartsburg will therefore intersect Route 122 near Hopedale and between Delavan and Hopedale.

The petition for leave to file the original bill in this case was presented to the circuit court on September 8, 1930. At that time the Department of Public Works and Buildings had located Route No. 122 from Delavan to Hopedale and Minier except that part which was dependent upon the future location of Route 121, the intention being to make the two routes coincident where it was feasible to do so, and the portion of Route 122 between Delavan and Minier had been divided for construction purposes into sections 126, 127 and 127B. The highway as located proceeded northeast from the end of Fourth street in Delavan to a highway near the northwest corner of section 11, town 22, range 4 west; thence east along the public highway to the southeast corner of section 5, town 22 north, range 3 west; thence it ran along the public highway in a northerly direction to a point about three-quarters of a mile south of the northwest corner of section 28, township 23

north, range 3 west; thence in a northeasterly direction to a point in the public road about forty-five rods east of the northwest corner of section 28; thence running in an easterly direction along the public highway to Hopedale and beyond. The bill alleged that no definite final location had been made of Route 121 on September 5, 1930, but Frank T. Sheets, chief highway engineer of the department, testified that after thorough investigation, which he detailed, the course of Route 121 from Morton to Hartsburg was determined and a few days later the formal order was entered on September 3, 1930. As thus located the two routes coincided, beginning at the southeast corner of section 5 and extending north for approximately three miles. The bill was amended to bring the location of Route 121 from Morton to Hartsburg within the scope of the litigation. The location of the north and south strip common to both routes has considerable bearing upon the location of Route 121 for the entire distance between Morton and Hartsburg, as will later appear. The case as made by the pleadings and the evidence and as contended in the argument is, not that Routes 121 and 122 as located are not feasible but that a possible location exists for Route 121 and the part which is common to both routes which is so far better than the location chosen by the department as to show an improper exercise of the discretion vested in the department in respect to the location of these highways, and that it was the legislative intent that Route 121 should be located approximately as proposed by the appellants.

No question is made of the propriety of locating the two routes in common for the distance of approximately three miles. The route proposed by the appellants as most desirable for Route 121 runs south from Morton, varying from a north and south line very little and only as the topography of the country makes a variance desirable, passing over a line which is one mile east of the three-mile north-and-south strip chosen by the department as a common roadway for

the two routes, and extending south through the far east side of Hartsburg to a junction southeast of Hartsburg with the route as located by the department. Should Route 121 be built upon this proposed location Route 122 would join it one mile east of the junction as located by the department and the two would coincide for a distance of three miles, one mile east of the location made by the department, and no further change in Route 122 would be required, nor would any disadvantage accrue to Route 122 by the change either as to cost, distance to be traversed by traffic or feasibility of construction. The case will therefore be considered as solely depending upon a proper location of Route 121. If Route 121 must be located as the appellants contend, of course the change in Route 122 follows.

Route 121 has been constructed or the contract let for its construction from East Peoria to a junction with Route 9 at the business center of Morton. Route 9 comes from the east on Franklin street and from its junction with Route 121 runs southwest on Tremont street, which runs from northeast to southwest through the town. The location of Route 121 made by the Department of Public Works and Buildings is the west of the two in controversy and begins at the pavement at the northwest corner of Morton and extends south along the corporate limits. The appellees contend that from a point of beginning at the northwest corner of Morton south along the west line of Morton and then east to the east location, then following the east location to the junction with the west location at the southeastern corner of Hartsburg, the distance is 26.8 miles, and that from the same point of beginning to the same ending the distance over the west location is 26.9 miles; and from the junction of Routes 9 and 121 in Morton the distance over the east location to the common junction southeast of Hartsburg is 26.4 miles, while the distance between the same starting and stopping points over the west location is 26.7 miles. The appellants contend that by the east lo-

cation from Bloomington street in Morton to the junction with the west route southeast of Hartsburg the distance is 25.48 miles, while by the west location from the northwest corner of Morton to the same point southeast of Hartsburg the distance is 27.20 miles, making a saving in pavement required of 1.72 miles. This saving is in part owing to the fact that the pavement of Route 121 has been or will be laid to the junction of Routes 9 and 121 in Morton, and that other pavements exist there which may be utilized by the east route in leaving the junction and going out of Morton to Bloomington street. It is obvious that the saving in distance to be traveled is slight. Furthermore, the saving in paving is at the most but .72 of a mile, for the connection required by the legislation at Emden is one mile to the west location or two miles to the east location.

Comparative cost of construction is likewise a small factor. Walter P. Backes, a graduate of Rensselaer Polytechnic Institute of Troy, New York, in civil engineering in 1911, with practical experience in his profession since his graduation, testified for the appellants: "I have made an estimate of the total cost of the designated route and the suggested route from their point of separation south of Hartsburg to their terminus. The total estimated cost of the designated route is $893,752 and the total estimated cost of the suggested route is $838,010. The difference in the cost of construction of these two routes is $55,742. The estimates of cost that I have arrived at are based on the same unit prices." For the appellees, John D. Mattison, assistant district engineer district No. 4 with the division of highways of the Department of Public Works and Buildings, testified: "My estimate of the total cost of constructing a road on the location selected by the State from the point of intersection with the road running through Morton to the northwest down through Hartsburg to the point where it would coincide with the yellow line proposed by the complainants for their location is $964,900, which

includes a spur to Emden. That also includes a three-mile section which would be used in common with 122. It includes a separation of grades with the Big Four railroad and Route 164, and also a separation of grades with the Chicago and Alton railroad and a crossing over the Mackinaw river and any other stream." He further testified as to the cost of construction from the starting point of the west location extending south along the west line of Morton and then turning east to the east location and following the east location from that point to the junction of the east and west locations southeast of Hartsburg: "My estimate on that line between those points is $980,147, including also the spur to Emden. I didn't attempt to follow a line through the central part of Morton and make any estimate on that line—the location proposed by complainants—for the reason there wasn't any suitable alignment available from the standpoint of good highway engineering, and it is undesirable to pass the route through the main business portion of Morton, where traffic is already congested, having Route 9 running through it."

A map of Morton was introduced in evidence showing that there is no street running south from the junction of Routes 9 and 121, and to use existing streets for the east location as proposed by the appellants would require four turns at street corners, and if Bloomington street is used as a part of the route there is the added disadvantage of sharing the street for several blocks with the railroad of the Illinois Traction System, which runs there. The estimates of Backes did not include in either case the cost of a spur to Emden. The east location requires an extra mile of spur road, the cost of which is about $25,000. Therefore the difference between the cost of construction of the two routes as estimated by Backes is, in fact, $30,742 and not $55,742, as the portion of his testimony which we have quoted indicates. In the estimate made by Backes he used forty cents as the cost of a cubic yard of grading, while

Mattison estimated grading at fifty cents a cubic yard. As Mattison did not estimate the cost of the east location as proposed by the appellants but carried it around Morton and as he did not use the basic cost for grading used by Backes, Mattison's estimates cannot be compared with or used as an answer to Backes' estimates. Therefore the evidence showed that the difference in cost of the two locations is, as Backes estimated, $30,742 in favor of the east location. However, the evidence shows that Route 121 for through traffic probably ought not to be carried through Morton. Route 121 has been constructed, or the contract let for its construction, on a diagonal course southeast from East Peoria to the junction of Route 9 in Morton. The west location proposes to branch off to the south from the northwest corner of Morton, crossing at once the tracks of the Illinois Traction System, which there lie adjacent to and parallel with the road as constructed or let to be constructed between East Peoria and Morton and a half mile from its station in Morton. Within the next quarter of a mile the west location also crosses the Vandalia railroad at a point more than a quarter of a mile west of its station and the Atchison, Topeka and Santa Fe railroad at a point about a quarter of a mile west of its station. About a quarter of a mile further south the west location crosses Route 9 also at grade but at right angles. These three railroad crossings are in the open country, diagonal and at grade and so far away from stations that railroad traffic over them may be expected to be at fast speed. The appellants contend that they constitute a death trap, for in the country automobile traffic is also fast, and particularly will the crossing of the Illinois Traction be dangerous, for there Route 121 as already definitely fixed parallels the traction road, and automobile drivers coming from East Peoria toward Morton cannot easily see a train coming up behind them. Any crossing of a railroad at grade is a traffic hazard and in the construction of highways is to

be avoided, if reasonably possible. However, in turning Route 121 south from Morton these three railroads and Route 9 must be crossed. The east location calls for crossing the railroads in Morton nearer to their stations at their intersections with streets, and the appellants argue that it is safer, for in the city of Morton traffic will be slower both on the railroads and on the streets and the crossings will be guarded, and thereby the danger of accidents will be lessened. This conclusion does not necessarily follow, for the crossings in the country may be well guarded by electrical devices, and, while traffic may be expected to be faster, vision is better. When there is thrown into the balance the tortuous course which must be followed along the streets of Morton to get from the junction of Tremont street, Franklin street and Route 121 to Bloomington street at the point where the east location joins it, we cannot say that the discretion reposed in the department has been abused in locating Route 121 along the west side of Morton, thus permitting through traffic to avoid the hazards and delays of congested streets. The decision of this question adds sufficient mileage to the east location to account for the difference in cost of the two locations as estimated by Backes, and the excess cost of the one location over the other disappears.

There is no direct highway between Morton and Hartsburg, and it was necessary to select from the various public highways by which travel may pass between the two, those upon which the hard-surfaced roads should be constructed. Both locations contemplate new rights of way, the east location necessitating about ten miles of new right of way and the west location about eight miles. There is, therefore, so far as the evidence shows, no substantial basis for selecting the one rather than the other because of existing roads.

The Big Four railroad and Route 164, adjoining that railroad on the south, the Mackinaw river and the Chicago

and Alton railroad are crossed by both the east and west locations as they proceed south, and the appellants contend that the east location crosses all of these obstructions under so much more favorable conditions than the west location that the east location is much to be preferred. The Big Four railroad and Route 164 are about five and a half miles south of Morton. The west location crosses them at grade, but where the east location crosses them they are in a cut, the railroad nine feet below the level of the ground to the south and Route 164 three feet below that level. Thus a less fill, resulting in less expense, would be required for an overhead crossing at the east location than the west, and at the east location an overhead crossing is necessary while at the west the crossing may be at grade. The appellants argue that a crossing of a railroad and an adjoining highway route at grade creates such a hazardous condition for traffic as to condemn it. It is feasible, however, to construct an overhead crossing at either place. It is only a question of expense, and it is shown that the total cost of either route from Morton to Hartsburg, including these overhead crossings on whichever location may be adopted, is practically the same.

Approximately the same situation exists at the respective crossings of the Chicago and Alton railroad. The west location proposes to cross it at grade on the prairie. The east location requires a subway, and there is a subway at that crossing, called the Orndorff subway, carrying an existing highway and a stream under the railroad. A subway is feasible at the west location crossing by a cut of the depth of approximately 18½ feet and drainage by tile below that depth for 1400 feet. These crossings occur in the three-mile strip which the two routes are to use in common. A separation of grades is always to be preferred if reasonably feasible. The existing subway at the east location is a double stone arch of keystone construction. The east arch is 18 feet wide and carries the present highway. Ow-

ing to the arch construction it is not wide enough to carry double traffic, as the arch begins at about five feet above the roadway. The maximum height of the arch above the roadway is 12 feet and seven inches. The west arch, of the same width and of a maximum height of 16.6 feet, carries the stream upon a bed which is five feet and eight inches lower than the present roadway. Except in extremely wet weather such as occurred in 1929 the stream does not rise above the roadway. In extremely wet weather, as drift indications show, it rose from two to three and a half feet above the roadway. The run-off is rapid, however, and the flooded condition can exist for only a short time. The subway which carries the roadway may be reconstructed by removing the arch, widening the roadway and raising its level. That the Big Four railroad and Route 164 are in a cut and the Chicago and Alton railroad is above the crossing at the east location while at the west location the crossings are at grade are circumstances to be considered by the department, along with all the other factors which should influence it in the exercise of the discretion reposed in respect to the location of this highway. They do not themselves necessarily control that discretion. A separation of grades is always desirable, but it may be not unreasonable in this instance to construct grade crossings in the open prairie, where the view is good. The fixing of the location of this three-mile strip has a large influence upon the fixing of the entire route from Morton to Hartsburg, because the three-mile strip of the west location is substantially in the north and south line of that location and the three-mile strip of the east location is substantially in the north and south line of that location, and to adopt one location and incorporate in it the three-mile strip of the other location would result in unnecessary additional corners and mileage.

The drainage is for the most part across both locations from the east. Consequently more water passes across the

west than the east location. From the north end of the three-mile strip to Hartsburg the two locations are a mile apart. North of the three-mile strip they separate to a distance of about a mile and a half, which is the maximum distance lying between them, and from that point, owing to the one or the other or both varying from a direct line, the distance of their separation is not constant. At the south line of Morton they are half a mile apart. Furthermore, Prairie creek, rising north of Morton, flows south between the two locations and empties into the Mackinaw river between them. Thus the drainage of the land between the locations is across the west location. The average distance between them is a little more than a mile, and the west location must make provision for the water falling upon the land between, in addition to the water passing across the east location. The mere fact that more water passes across the one location than the other is not considered a factor of material importance as culverts required for the one will in most cases care for the other, but the Mackinaw river and its tributary, the Little Mackinaw creek, and their crossings, are considered by the appellants a material factor. The east location crosses the Mackinaw river at right angles about two and three-fourths miles north of the north line of Hopedale extended west, at a place where the bed of the river lies about midway in the river valley, the distance from the river to the north bluff being 1000 feet and to the south bluff 1200 feet, and the natural tendency of the river is to maintain its present position. From that point the river flows west for about a half mile and then southward for about a mile and three-fourths, where it turns westward and flows at a slight angle across the west location at a point where the valley is 2800 feet wide, 2300 feet of the valley being north and 500 feet south of the crossing, where, also, the appellants contend, the natural tendency of the river in high water would be to throw its current against the embankment of the highway

to be built north of the river, to change its course and damage or destroy the highway. There is merit in the contention that the east location furnishes a better place for a highway crossing than the west, for the river valley is 500 feet wider at the west location than the east, the crossing of the valley at the west location is diagonal while at the east location the crossing is at right angles, and the river bed at the west location is near the south side of the valley, and the stream in high water might perhaps more readily change its course and beat against the highway embankment than at the east location, where it is practically in the center of the valley and follows a straight course. Still, the west location crossing as planned is shown to be feasible and a change there in the course of the river is merely a possibility—not a probability. There is, therefore, not enough in the testimony relative to these two crossings to justify a court in holding that the department should have considered the superior advantages of the east location in the crossing of the Mackinaw river of sufficient importance to require the selection of the east location from Morton to Hartsburg rather than the west.

South of the Mackinaw river there is some disadvantage in each location. After crossing this river the east location crosses the Little Mackinaw creek and the low land adjoining. The Mackinaw creek empties into the Mackinaw river between the two locations, and its waters will be carried under the proposed bridge for crossing the Mackinaw river on the west location. On the other hand, the west location, one and three-fourths miles west of Hopedale at the north end of the three-mile strip to be used by both highways, crosses Snake Hollow. Making a comparison between the Little Mackinaw creek and Snake Hollow the appellants state: "The territory along the Little Mackinaw creek in section 16 is mostly open pasture land and is practically free from timber, but Snake Hollow has timber on both sides of it, and toward the south the location of

appellees for Routes 121 and 122 is through standing timber and through rough land for a mile and a half. * * * The valley of the Little Mackinaw may be crossed at any place desired at easy grades, whereas in Snake Hollow it is so steep, rough and irregular along the west section line of section 28 that in order to get the location through there at all it is necessary to divert the line forty-five rods east on a long descending and ascending curve. * * * Any slab laid on such a location, at the same time it is curving either to the right or the left, as the case may be, will be descending into the hollow and still curving as it crosses the hollow and still curving as it ascends out of the hollow up to level ground again. Traffic on this alignment will, at the same time it is turning on the curve, be driving either downward or upward." The force of this comparison is apparent and the relative disadvantages of the one or the other were elements requiring the exercise by the department, its engineers, officers and agents, of executive discretion upon fair consideration of all the conditions.

South of the three-mile strip the east location runs over comparatively high land not subject to overflow while the west location for almost a mile in Boynton township is over low lands, with an open ditch of insufficient capacity to take care of the water coming into it in times of excessive rain. Toward the south end of this low strip a ditch crosses it, which, even with comparatively light rains, overflows and floods the highway location. Further south for the three miles immediately north of the north line of Hartsburg the west location passes through what was formerly known as the Scully swamp—very low land below the level of the east location. For this distance the highway on the west location must be built on an embankment, because otherwise any substantial rain will flood it for a quarter of a mile. The east location follows a straight line south through the unsettled extreme east part of Hartsburg, about a quarter of a mile east of the residences, to a junc-

tion with the west location north of and adjacent to the Illinois Central railroad. The west location reaches the Illinois Central railroad at the extreme northwest of Hartsburg, and follows the railroad, without crossing it, over a new right of way southeast through the business section of Hartsburg to a junction with the east location, necessitating the moving of an elevator and several houses.

The appellants argue also that the legislation authorizing the construction of this and other roads, and a consideration of the locations of communities along this route from Morton to Hartsburg, show that the legislature intended that the route should be located as far east rather than as far west as possible, within the direction of the statute that the road should extend southeasterly from Peoria, affording Morton and Hartsburg (with an extension to Emden) reasonable connections with each other and with the other towns and cities named. Route 24 (a north and south route) extends south from Pekin as far as about Emden at a distance of about ten miles west of the west location. To the east of Route 121 there is no north and south route nearer than Route 2, a part of which extends from Bloomington to Decatur, about twenty-four miles east of the east location, though the diagonal Route 4 extends from Springfield to Bloomington, with which Route 121 makes connection at Lincoln, and indirectly, through Route 122, at Bloomington. Thus the farther west Route 121 is located from Morton to Hartsburg the farther those residing east of it will have to travel to get to it as a north and south route, and the contention is that those living west of Route 121 will be well enough served by Route 24 as built and by Route 121 located as far to the east as the legislative directions will permit, while those residing east of Route 121 will not be as well served as those residing west of the route in this respect even though Route 121 is located as far to the east as the legislative directions will permit.

In this connection the pleadings and evidence presented the proposition that the communities east of Route 121 to be served by it as a north and south route were more important in population than the communities west of the route, and the ordinary line of travel between Hartsburg and Hopedale and Hopedale and Morton customarily followed was nearer the east than the west location. The two locations for the twenty-five miles from Morton to Hartsburg are a mile apart most of the way and the greatest distance between them is a mile and a half. Route 121 as described in the statute named no places between Morton and Hartsburg. Backes testified that he had made a computation of the population in the territory through which these proposed locations run to determine the center of population, taking the government census of 1920-25 and determining the distance of each village from a base line; that he determined a line running north and south and found the line which indicated the center of population, including the towns of Morton, Tremont, Dillon, Emden, Hartsburg, Armington, Hopedale, Minier, Mackinaw, Allentown and Groveland; that the line indicating the center of population would pass one-quarter of a mile west of the dotted red line, which is complainants' suggested route (east location) between Hopedale and Hartsburg. It would coincide with the suggested route through sections 4 and 9 in Hopedale township north of Hopedale. Upon cross-examination Backes testified: "I made computations as to the actual center line of population based upon the population of certain cities and villages east or west or upon Route 121. The cities and villages I took into consideration in making that computation east of the line were not considerably farther away, as a general rule, than the cities and villages west of the line. No, it is not true the greater the difference in distance the more it would tend to draw the line to the east. The larger the town the more it would tend to draw it. They both vary as to both distance and population. If

the distance remains constant the rate of population would govern. If the number of people remains constant the distance would govern. It would not draw it farther east although you might have the same population. It would draw it midway between the towns. That is how the government determines the center of population of the United States. The mere fact that the cities and towns to the east are farther away will not pull the line farther to the east—not unless the cities to the east are the same population as the cities to the west. If you assume that they are of the same population that would have some effect. I have taken into consideration the towns of Mackinaw, Armington and Minier to the east." He was asked: "These towns vary in distance from the line from Morton to Hartsburg from five to seven miles to the east?" and answered: "Delavan is seven miles west. I have taken those towns into consideration that lay from five to seven miles to the east. On the west line, outside of Morton and Hartsburg, Tremont is only about one-half mile west of the State location. Delavan is four and one-half miles west of the State location. The fact that to the west the towns are closer to the line is not what governs the location. The towns to the west are closer to the State's location than to the complainants'. I assumed that the farms are as densely populated on one side as the other. In comparing the length of these two routes I started from the intersection of the new road which has been built out from Morton, and the proposed location of the State road near the center of 17— that is, it is a little above the northwest corner of Morton."

The usual and customary line of travel between Hartsburg and Hopedale, except Emden, has been toward and through the subway under the Chicago and Alton railroad and more nearly along the east location than the west, for the west road leading north from Hartsburg went through lower land (Scully's swamp) than the east and at times was water-covered. Likewise, travel from Delavan to Hope-

dale has been through the Chicago and Alton subway. The usual line of travel between Hopedale and Morton has also more nearly followed the east than the west location, making use of the Smith bridge, crossing the Mackinaw river about a quarter of a mile east of the east location. There was, however, no direct route from Hopedale to Morton.

It was not practicable for the legislature to describe in minute detail the particular course of every portion of each one of the 185 routes of the State-wide system of hard-surfaced road for which it provided in the two Road Bond Issue acts which it passed in 1917 and 1923. Exercising its power to delegate authority to do what it might properly do but could not under the circumstances advantageously or understandingly do itself, (*People* v. *Reynolds,* 5 Gilm. 1,) it vested authority in the Department of Public Works and Buildings to select the particular highways, within reasonable limits, on the general routes designated by the State and to make such minor changes in the routes as might be necessary for the best interests of the people of the State. The legislature fixed the routes upon which the roads are to be constructed in a general way by naming the termini, and delegated to the Department of Public Works and Buildings the power to determine the exact public highways between the termini upon which the roads should be constructed. That determination was not left, however, to an arbitrary discretion, but the roads were required to be constructed between the termini substantially on the routes designated so as to connect the different communities and principal cities of the State and so as to afford the different places named and the intervening communities reasonable connection with the termini and with each other. (*Mitchell* v. *Lowden,* 288 Ill. 327; *Wiley* v. *Department of Public Works,* 330 id. 312; *Hayes* v. *Department of Public Works,* 336 id. 233; *Stewart* v. *Department of Public Works,* id. 513.) The defendants did not have unlimited discretion but only such discretion as is provided

by the statute. *Watts* v. *Department of Public Works,* 328 Ill. 587; *McGregor* v. *Miller,* 324 id. 113.

When public officers are vested with discretionary power a court of equity will not interfere to control such discretion unless fraud, corruption, oppression or gross injustice is shown. (*Stratton* v. *Henkel Construction Co.* 320 Ill. 526; *Hill* v. *Kimball,* 269 id. 398; *Hallett* v. *City of Elgin,* 254 id. 343; *Stewart* v. *Department of Public Works, supra.*) Where two highways are available, each of which is within the purview of the act and affords the communities reasonable connection with each other and with other communities, the department is authorized to select the one which is for the best interest of the State. To justify a court in holding unjust, unreasonable or oppressive the act of the Department of Public Works and Buildings in designating the route for the construction of a hard-surfaced road under the provisions of the first or second Road Bond act, it must clearly appear from the evidence that there has been an abuse of discretion and an oppressive exercise of power in the location of the road. It is not enough that there should be a difference of opinion between the court and the officers of the department. The questions of the location of the road and the manner of its construction are committed to the judgment of the department, and that judgment must be conclusive unless the evidence clearly satisfies the court that the department's action has been oppressive and without reasonable grounds. If there is room for reasonable difference of opinion the department's action is conclusive. Examples of cases in which the court has set aside the action of the department are *Watts* v. *Department of Public Works, supra,* in which this court reversed the decree of the circuit court of LaSalle county, which dismissed a bill for injunction for want of equity, and remanded the cause with directions to grant an injunction to restrain the department from laying out, locating and improving a certain line as a part of Route 23 of the

State-wide system of highways; and *Fisher* v. *Department of Public Works*, 338 Ill. 222, in which the court affirmed a decree enjoining the department from awarding any contract for the construction of a hard-surfaced road on section 117 of Route 100 of the State Bond Issue act of 1923 as located by the department. In each of those cases the department had entirely abandoned the route indicated by the statute, and in the first case had located a line over seventeen miles long running in a different direction from the general route indicated in the statute and not serving in any way the intervening communities between the places named in the statute. In the second case the route selected between two intervening communities named in the statute went out of the way to include another community not named which was included in another route, and the route selected was nearly twice as far as another more direct and just as feasible route which could be used to connect the communities named and which would afford the State at large a more direct route between more distant communities on the route as described in the statute. In those cases it was held that the Department of Public Works and Buildings and its officers were without authority to construct the roads in the manner which they were proposing. In *Hill* v. *LaSalle County*, 326 Ill. 508, also, it was held that a petition for leave to file a bill to enjoin the expenditure of money in the construction of a hard road under the State Bond Issue acts showed reasonable ground for filing the bill, where it averred that the proposed route, instead of following an existing public highway, would run·for eighteen miles over territory in which no highway had ever existed, requiring the purchase of an extensive right of way.

The line of the center of population of the communities intervening between Morton and Hartsburg does not appear to us to be an item of serious importance. The evidence shows that it is only about a mile east of the west

location. Nor is it of more importance that the line of travel south of Hopedale and between Hopedale and Delavan has usually followed the road leading under the Chicago and Alton railroad or that traffic over the Smith bridge has been east of the west location. These were all matters for the consideration of the department in connection with the general convenience of the people of the State at large. The intervening communities will be well served by either route. A local custom of travel may be disregarded where another route serves the people of the State better and at the same time meets the requirements of the inhabitants of the particular places which it is to serve. We have seen that by skirting Morton on the west, through traffic—that is, the use of the people of the State generally—is better served than by carrying the route through Morton. The same railroads must be crossed in either case, and if traffic is carried through Morton the inconvenience of traffic congestion and turns at street corners is added. As the department has planned it the route will skirt Morton, with a stub into the center of the town. Likewise, the route as planned by the department does not enter Hopedale, but Hopedale is served by the continuation east of Route 122.

We find no basis in the evidence for holding that the action of the department in the selection of the route from Morton to Hartsburg was unreasonable, arbitrary, corrupt or oppressive or was in disregard of the primary interest of the State at large or the statutory requirement of affording the places named in the statute and the intervening communities reasonable connections with each other. The evidence does not show a case which justifies judicial interference with the executive discretion of the Department of Public Works and Buildings.

The decree is affirmed.

*Decree affirmed.*