(No. 21596.—

THE CHICAGO NORTH SHORE AND MILWAUKEE RAILROAD COMPANY *et al.* Appellees, *vs.* THE COMMERCE COMMISSION *ex rel.* The Department of Public Works and Buildings, Appellant.

*Opinion filed October 21, 1933—Rehearing denied Dec. 7, 1933.*

DeYoung and Shaw, JJ., dissenting.

Otto Kerner, Attorney General, and Harlington Wood, for appellant.

Ralph R. Bradley, Frederick E. Stout, and Nelson J. Wilcox, for appellees.

Per Curiam: The superior court of Cook county entered an order setting aside an order of the Illinois Commerce Commission entered on a petition of the Department of Public Works and Buildings (hereinafter called the Department) authorizing the construction of a subway under the tracks of the Chicago North Shore and Milwaukee Railroad Company (hereinafter called the North Shore) and the Chicago and Northwestern Railway Company (hereinafter called the Northwestern) at a point where the rights

of way of the two railroads are about 500 feet apart in the village of Niles Center, in Cook county, to carry State Bond Issue Route 57 under the tracks of the railroads. The order of the superior court was entered on the appeals of the railroad companies from the order of the commission. The two railroad companies appealed separately to the superior court. The subject matter of both appeals being the same, they were consolidated and heard on one record in the superior court, and the Department has appealed from the judgment in the consolidated case.

Route 57 is described in the act which authorized it (Laws of 1923, p. 512,) as "Beginning at the northerly city limits of Chicago in Tessville and extending in a northerly direction to Highland Park affording Tessville, Niles Center, Northfield, Highland Park and the intervening communities reasonable connections with each other." Niles Center adjoins Tessville on the north. The order of the Commerce Commission made findings that the Department was authorized to lay out and construct Route 57; that Route 57 as laid out extended across the tracks and rights of way of the railroads by means of proposed under-crossings in the village of Niles Center; that portions of Route 57, both north and south of the proposed crossings, had been constructed, the pavement upon the constructed portions being 40 feet wide and the right of way 100 feet wide; that the highway had been planned with the ultimate view of constructing the pavement of a width of 80 feet; that over the Northwestern a heavy freight traffic is handled and also a certain amount of rather high-speed passenger business; that over the North Shore, which is a double-track, electrically operated railroad, more than 300 trains are operated daily, some of which move at a high rate of speed; that due to the heavy traffic that will develop on and move over Route 57, due to its direct alignment, easy curvature, wide right of way and wide pavement, the grades should be separated at the intersections

of the highway with the railroads, and in the interest of public safety and convenience the petitioner should be authorized to extend the highway underneath the respondents' tracks by means of double 14 x 44 feet openings and across their respective rights of way as prayed for by the petitioner and as shown on the plans attached to its petition, the right, according to law, to cross the respondents' rights of way first having been secured and the highway first having been legally opened up on both sides of respondents' railroads at the crossing locations before the work of such extension is started; that the petitioner should be required to perform the work of excavation of the subway and its approaches, the work pertaining to the necessary drainage of the subway, and should construct at its sole expense the pavement on the approaches and through the subway, and should be required thereafter to maintain at its sole expense the work which it constructed; that the Northwestern should be required to construct the substructure and superstructure of the bridge required to support its tracks over the subway and thereafter to maintain such structures at its sole expense; that the North Shore should be required to construct the substructures and superstructures of the bridge required to support its tracks at the proposed crossing of its railroad, the substructures to provide for four-track construction and the superstructures to provide for two-track construction, and should be required thereafter, at its sole expense, to maintain the structures; also, that the North Shore should be required to construct the substructures and superstructures of the bridge necessary to carry its yard tracks, existing or proposed, such structures to be of such track-carrying capacity as the North Shore might elect to have constructed at the time of the construction of the highway, and the North Shore should be required thereafter, at its sole expense, to maintain them; that the petitioner should be required to bear sixty per cent of the total expense incurred in the construction of the

proposed under-crossings, the highway pavement not being considered a part of the expense of such construction; that the Northwestern should be required to pay forty per cent of the total expense incurred in the construction of the proposed subway under its tracks and the approaches thereto and necessary gutters and twenty per cent of the total drainage expense incurred in the crossing of both of the respondents' railroads, and that the North Shore should be required to bear forty per cent of the total expense of the proposed subway under its tracks and the approaches thereto and necessary gutters and twenty per cent of the total drainage expense incurred in the crossings of both of the respondents' railroads. Thereupon it was ordered that the Department be authorized to extend Route 57 by means of double 14 x 44 feet openings under the tracks at a certain point in the northwest quarter of section 27, township 41 north, range 13 east of the third principal meridian, in the village of Niles Center, as prayed for by the petitioner and as shown on the plans attached to the petition and made a part thereof, the petitioner first having secured the right, according to law, to cross the companies' rights of way at the point in question and the highway first having been legally opened up on both sides of the respondents' railroads at the crossing locations. It was further directed that the Northwestern be directed to begin the construction of the bridge structure necessary to support its tracks at the location of the crossing authorized to be formed on its railroad, the substructure of such bridge to provide for a four-track construction and the superstructure to provide for respondent's two existing main line tracks and to proceed diligently with the construction of the bridge structure until completed and thereafter at its sole expense to maintain that structure; that the North Shore be directed, within sixty days after the petitioner has secured the right to cross its right of way, to begin the construction of the bridge structure necessary to support its tracks at the location of

the crossing authorized to be formed, the substructure of such bridge to provide for four-track construction and the superstructure to provide for the respondent's two existing main line tracks, also to proceed with the construction of its bridge necessary to support its tracks at the crossing of the yard tracks, existing or proposed, the latter to be of such track-carrying capacity as the respondent might elect at the time the under-crossing was constructed, and should proceed diligently with such construction until the same was completed and thereafter at its sole expense maintain such structures. It was further ordered that the entire expense incurred in the construction of the crossing authorized to be formed under the tracks of the Northwestern, including the approaches, gutters and drainage but not the pavement proper on the highway, should be borne in the proportion of sixty per cent by the petitioner and forty per cent by the respondent, the drainage expense chargeable to the respondent being twenty per cent of the total expense necessary to construct the entire drainage system for the crossings on both of the respondents' railroads, and that the total expense incurred in the construction of the crossing authorized to be formed under the tracks of the North Shore, including the approaches, gutters and necessary drainage, should be borne in the proportion of sixty per cent by the petitioner and forty per cent by the respondent, the drainage expense chargeable to the respondent being twenty per cent of the total expense necessary to construct the entire drainage system for the crossings on both of the respondents' railroads. The respondents were required to report in writing to the secretary of the commission the date on which the work required to be performed by them had been fully completed and should mail the report to the secretary not later than five days after the completion of the work.

Prior to the location of Route 57 there was no highway crossing the tracks of the railroads at the place where this

subway is to be constructed. Part of Route 57 as laid out by the Department and partly constructed is new, since the route does not in its entirety follow existing roads. The communities which the legislature directed should be furnished connection with each other are a part of the metropolitan area surrounding Chicago, extending northward from the city of Chicago. The route as laid out extends from Tessville northward, west of the communities bordering on Lake Michigan, past Highland Park, to the south line of the adjoining community, Highwood. At that point it is proposed to connect it with Route 68, a north and south highway carrying traffic to the Wisconsin line, where it will connect with a Wisconsin route; that the proposal is thus to make Route 57 part of a wide thoroughfare carrying traffic between Chicago and its adjoining communities and places north and south of Chicago, in Illinois and other States, furnishing routes for traffic around the congested city on an approximately direct north and south line to the Wisconsin State line. When the through route is completed it is anticipated that from 35,000 to 50,000 automobiles a day will be driven over it. At present there are three other through routes from Chicago or its vicinity to the Wisconsin State line which are over-burdened with traffic. They are Route 42 on the east, which is a continuance of Sheridan road near the lake; Route 42A, a Federal Aid highway, also known as Waukegan road, which is a continuance of Harlem avenue in Chicago; and State Bond Issue Route 21, also known as Milwaukee avenue. Route 42 has many turns, extends directly through the many communities bordering on the lake, and is not located, designed or suited for rapid transit. Route 42A is about six miles further west. Its pavement is 40 feet wide, and traffic over it is much congested, especially at week ends. Route 21 is about eight miles from the lake. There are also three other roads of less importance. Route 57 lies about midway between Routes 42 and 42A. It is an ex-

tension of Cicero avenue. Its south end is Route 50, which extends to Route 49, which has a 40-foot pavement as far as Kankakee. With Route 50 it intersects all routes coming into Chicago from the west and southwest. Route 57 will also be easily available for the use of automobiles coming from the south on the Dixie highway, (Route No. 1,) and from Indiana and further east. As laid out and designed by the Department it will be a part of a State-wide system of hard roads. Whether or not it will conveniently serve the purposes of the communities mentioned in the act which provided for its construction is seriously questioned by the railroads, the appellees here. As laid out, Route 57 avoids congested sections of the communities mentioned in the law directing its construction. From all of these circumstances the appellees argue that the road laid out by the Department, a part of which is to be the subway here involved, is not the Route 57 of the legislative design.

Tessville is north of and immediately adjacent to the city of Chicago. The Northwestern enters it from the south at a point on the boundary line a short distance east of Cicero avenue and traverses the whole width of Tessville and Niles Center in a direction a little west of north. The North Shore enters Niles Center from the east several miles east of the Northwestern and runs directly west, until, when near the Northwestern, it turns to the north and by a wide curve takes a course practically parallel with the Northwestern through Niles Center and further to the northwest. Cicero avenue approaches the Northwestern in the village of Niles Center from the south, near the point where the North Shore approaches it, as has been described, from the east. The angle of intersection is very acute and the avenue has not been opened across the railroads. Route 57, approaching the Northwestern from the south along Cicero avenue, curves to the east to cross the railroad at an angle of forty-five degrees. The tracks of the two railroads are about 800 feet apart here, and about half

way between them Route 57 curves to the left, crossing the North Shore railroad at an angle of about forty-five degrees, and about 800 feet further northwest, near the grade crossing of Oakton street by the railroads, it reaches the North Shore railroad, becomes parallel with it until the extended line of Cicero avenue is reached, and then proceeds north over the extension of Cicero avenue.

The appellees argue that section 58 of the Public Utilities act, hereinafter considered, confers no jurisdiction on the commission to order grade separation of unlawful highways which are proposed to be made to cross existing railways; that the crossing of the railroads which the appellant proposes to make is not a crossing for a lawful highway, and its only resemblance to lawful Route 57 is that it begins in Tessville and extends in a northerly direction. Route 57, it is said, is a creature of the legislature and easily identified. The argument rests upon the words of the title and body of the act "in relation to the construction by the State of Illinois of durable hard-surfaced roads upon public highways of the State along designated routes, and the provision of means for the payment of the cost thereof by an issue of bonds of the State of Illinois." (Laws of 1923, p. 512.) Section 1 provides for the construction of a "State-wide system of durable hard-surfaced roads * * * upon public highways of the State, along the hereinafter described routes, as near as may be." Section 2 authorizes the Department of Public Works and Buildings to take the necessary steps to cause "said system of roads to be constructed at the earliest possible time." Section 7 provides that the Department of Public Works and Buildings shall construct "upon and along said highways durable hard-surfaced roadways * * * of sufficient widths to meet the requirements of the reasonably expected traffic thereon, such widths, except in extreme cases, to be not less than nine feet nor more than 20 feet. * * * The old bridges which form parts of the present roads shall, whenever such

bridges are in proper condition, be used in said proposed system." Section 8 requires the Department of Public Works and Buildings to make all reasonable efforts to have the entire State-wide system of roads provided for, completed within five years after the first construction contracts are awarded. By sections 9 and 12 it is provided that "the general location of the routes upon and along which said proposed roads are to be constructed shall be substantially as described in this section, so as to connect, with each other, in substantially the manner hereinafter described in this section, the different communities and the principal cities of the State; however, the said Department of Public Works and Buildings shall have the right to make such minor changes in the location of said routes as may become necessary in order to carry out the provisions of this act, · to-wit: * * *

"Route No. 57.

"Beginning at the northerly city limits of Chicago in Tessville and extending in a northerly direction to Highland Park affording Tessville, Niles Center, Northfield, Highland Park and the intervening communities reasonable connections with each other."

"Sec. 12. * * * No public utility company or person shall be granted any right, privilege or franchise in, on or along any such highway without the consent of said Department of Public Works and Buildings," etc.

Section 58 of the Public Utilities act, (Cahill's Stat. 1931, chap. 111a, par. 77, p. 2213; Smith's Stat. 1931, chap. 111⅔, par. 62, p. 2266;) after prohibiting the future construction of railroad crossings of other railroads or of public highways at grade without having first procured the permission of the Commerce Commission, provides that the commission shall also have power, after a hearing, to alter or abolish any grade crossing heretofore or hereafter established, when in its opinion the public

safety requires such alteration or abolition, or to require a separation of grades at such crossings, or to require a separation of grades at any proposed crossing where a proposed public highway may cross the tracks of any railroad or railroads, and to prescribe, after a hearing of the parties, the terms upon which such separation shall be made and the proportion in which the expense of the alteration or abolition of such crossings or the separation of such grades shall be divided between the railroad or street railroad companies affected, or between such companies and the State, county, municipality or other public authority in interest.

The appellees contend that the proposal here is for a separation of grades at a proposed crossing, and that the power of the commission relating to it is found in the provision of section 58 giving power to the commission "to require a separation of grades at any proposed crossing." The appellant, on the other hand, contends that the proposal is for a re-location of a crossing. In fact, the proposed crossing will not supplant or replace any existing crossing. There are several highway crossings of the railroads at grade which possibly might have been used for Route 57. The appellees insist that they should have been so used, and that the route laid out and located by the Department is not Route 57 authorized by the statute, because they say it is not upon public highways of the State along the designated routes described in the statute; that it is not any part of a State-wide system of roads upon and along the public highways of the State and the routes designated by the statute; that its general location is not substantially as described in the act, with such minor changes as are necessary to carry out the provisions of the statute, does not connect, in substantially the manner described in the act, the different communities and the principal cities of the State, and does not extend to Highland Park or afford Tessville, Niles Center, Northfield and Highland

Park, and the intervening communities, reasonable connections with each other, and that it exceeds the width of 20 feet mentioned in the statute without any showing that it is an extreme case. Route 57 of itself is comparatively a very small part of the State-wide system of roads directed to be constructed by the act of 1923. Its mileage is insignificant. That fact is no indication of a legislative intention to establish it merely as a local road, for the convenience, especially, of the communities through which it would pass. The State bond issue acts were intended to establish a planned scheme of many parts, all combined for the one purpose of furnishing reasonable connections throughout the State for transportation and travel to and from all parts of the State. The system was designed for the benefit of the whole public, and not specially or primarily for the use or convenience of that part of the public which happened to live or do business in the particular localities through which the roads should be constructed. It was, of course, impossible to construct all the roads of the system at once. Even to design a scheme complete in detail would necessarily require a long time, and therefore the legislature did not undertake more than to direct that the State-wide system of roads, and all work incidental thereto, should be under the general supervision and control (subject to the approval of the Governor) of the Department of Public Works and Buildings, which was authorized and directed to cause the system of roads to be constructed at the earliest possible time consistent with good business management. The Department was directed to divide the roads into convenient sections for construction purposes and make all reasonable efforts to have the entire State-wide system of roads completed within five years after the first construction contracts were awarded. The Department was authorized and required to make all final decisions affecting the work and make all rules and regulations it might deem necessary for the proper management and conduct of

the work and for carrying out all the provisions of the act in such manner as should be to the best interest and advantage of the people of the State. Every road in the State mentioned in either the first State Bond Issue act in 1917 or the second Bond Issue act is a part of the State-wide system of hard roads. None of them, whether twenty miles long or two hundred, is merely a local road primarily for the reasonable and convenient connection of its termini and the intervening communities but all are primarily members of the State-wide system. The statutes expressly imposed upon the Department the duty of construction and control, subject to the Governor's approval, and whenever and wherever any portion of the State-wide system of roads is constructed it is the interest of the whole public which is the controlling element. Naturally, the interests of the communities through which or in whose vicinity the road or particular part of a road is being constructed will receive consideration, but not to the prejudice of the interest of the State or the whole public. It is the latter interest which is entitled to first consideration. We have held under each of these State bond issue acts that the Department which is authorized and required to make all final decisions is vested with authority to select the particular highways, within reasonable limits, on the general route designated by the statute and to make such minor changes as may be necessary for the best interest of the people of the State. *Mowry* v. *Department of Public Works,* 345 Ill. 121; *Boyden* v. *Department of Public Works,* 349 id. 363; *Hayes* v. *Department of Public Works,* 336 id. 233; *Stewart* v. *Department of Public Works,* id. 513; *Wiley* v. *Department of Public Works,* 330 id. 312.

In the case first above cited the question involved the location of Route 121 between Morton and Hartsburg. The two towns were twenty-five miles apart and there was no direct highway between them. It was necessary to select from the various public highways by which travel might

pass between the two towns those upon which the hard-surfaced roads should be constructed. The Department had located Route 121 from Morton to Hartsburg, and a bill was filed by leave of court to enjoin the awarding of any contract for the construction of the road on the route selected, the complainant contending that there was another route so much better than that chosen by the Department as to show an improper exercise of the discretion vested in the Department in respect to the location of these highways. Each location contemplated new rights of way, the one about ten miles and the other about eight miles. There was, therefore, it was said in the opinion, no substantial basis for selecting the one rather than the other because of existing roads. It was held that when public officers are vested with discretionary power a court of equity will not interfere to control such discretion unless fraud, corruption, oppression or gross injustice is shown. It is not enough that there should be a difference of opinion between the court and the officers of the Department. The question of the location of the road and the manner of its construction are committed to the judgment of the Department, and that judgment must be conclusive unless the evidence clearly satisfies the court that the Department's action has been oppressive and without reasonable grounds. If there is room for a reasonable difference of opinion the Department's action is conclusive.

The Department, in determining the location of a road under the bond issue acts, must consider, first, the interest of the State at large and not of the particular locality in which the road is constructed. It must consider the probable amount of travel and the relation of the particular road whose construction is under consideration to the other roads of the State-wide system. The various parts of the State-wide system must necessarily be constructed in sections, and the importance of any particular section of the road to the completed system does not necessarily de-

pend, alone, upon its length or the part of the State in which it lies. It depends largely on the conditions and volume of the traffic it may have to accommodate and somewhat on the density of the population. A comparison of the short piece of road in question here with all the miles of hard-surfaced road constructed in the State is no indication of the importance of the road to the State-wide system or the public, generally, who use it. It is in the congested metropolitan district of the city of Chicago. It is in the course of travel between that city and other places beyond it and the city of Milwaukee and other places north and northwest. The number of automobiles which it is expected will use the road has been given, and it is manifest that the road, when completed, will be a part of a great artery of travel. It cannot justly be said that the legislature, when this short route was authorized, expected it to be merely a local road for the convenience of the communities through which it passes. The great volume of traffic which is anticipated and is inevitable will swallow the local traffic, which will not be noticeable. The communities mentioned in the statutes will still have their reasonable connections with each other, and while these connections, perhaps, may be less convenient at times, still the people of the State in general have the same right on Route 57 of the State-wide system of roads as the people living along Route 57, and their rights cannot be abridged. The Department was authorized, in extreme cases, to construct the roadways of sufficient width to meet the requirements of the reasonably expected traffic. The evidence shows such a case. The evidence established an extreme case for the Department to exercise its power to construct the roadway of the width proposed. Route 57 was lawfully located along Cicero avenue, and the Illinois Commerce Commission had power to require the separation of grades at the crossing and apportion the expense of the separation.

It was not necessary that the whole length of the route should have been definitely located before work was begun on any part of it. This route, so far as appears from the evidence, was located through the town of Niles Center on an established street (Cicero avenue) which existed both north and south of the railroads but had not been extended across the railroads, and it was the judgment of the Department that the most feasible place and method of crossing the two railroads were at the place and in the manner sought to be employed in this proceeding. It was located, by the authority on whom the power and duty of location had been imposed by law, across the railroads, and so far as they were concerned the road was lawfully established.

In support of the judgment entered by the court below the appellees contend that there were no sufficient findings of fact in the order of the commission which justified the apportionment of the cost which the commission made between the State and the appellees. Section 58 of the Public Utilities act authorizes the commission to require a separation of grades at any proposed crossing of the track of any railroad by a public highway, to prescribe the terms upon which such separation shall be made, and the proportion in which the expense of the separation of grades shall be divided between the railroad company and the State, county, municipality or other public authority in interest. By its order the Commerce Commission found, in substance, what the evidence for the petitioner and the respondents tended to prove with reference to benefits and the lack of benefits that would accrue to the parties to the record by the construction of the proposed subway. Section 65 of the Public Utilities act requires the commission to make findings of fact on the principal issues, sufficiently specific to enable the court to review intelligently the decision of the commission and ascertain if the facts found afford a reasonable basis for the order. From the mere fact that the order of the Commerce Commission

does not comment upon the evidence of the railroad companies it does not follow that such evidence was not considered by the commission. The only question for review by this court is whether or not the findings of the commission are supported by the evidence. While we might not be disposed to agree in the first instance with the cost of the proposed improvement as apportioned between the appellant and the appellees, yet under the decisions of this court our investigation is limited to the question of whether or not the commission acted within the scope of its authority and whether its findings are without any foundation in the evidence, or whether a constitutional right has been infringed by such findings. The orders of the Commerce Commission are, and of right ought to be, entitled to great weight, and can be set aside only when it is clearly apparent that such orders are arbitrary or are unreasonable or directly contravene some established rule of law. The law does not authorize this court to try the question in controversy anew and substitute its judgment for that of the Commerce Commission. (*Campbell* v. *Commerce Com.* 334 Ill. 293; *Wabash, Chester and Western Railroad Co.* v. *Commerce Com.* 309 id. 412.) We cannot say that the apportionment of the costs between the parties is without substantial evidence to support such finding. We are of the opinion that the findings of fact as made by the Commerce Commission in its order are sufficient, under the rules of law, to sustain its order that the grades should be separated at the intersections of said highway with the appellee railroad companies' rights of way and apportioning the costs of the construction of the proposed subway and the future maintenance thereof.

The appellees argue that the proceedings before the commission did not include all the necessary parties; that the municipalities named in the act, Tessville, Niles Center, Northfield and Highland Park, were the principal beneficiaries of the route, and that in the distribution of the

expense of grade separation all the beneficiaries of the route should participate, but that only the county of Cook and the village of Niles Center, besides the appellees, were made respondents or notified to appear at any hearing. The assumption that the municipalities which were named in the act describing the route were the chief beneficiaries of the route, with special privileges and responsibilities, has no foundation in the act or in the purpose of establishing a State-wide system of durable, hard-surfaced roads. The object in constructing these State roads was to benefit the whole people, and the benefit received by any municipality or community in the vicinity of the roads was altogether secondary and incidental. It cannot be assumed that all or any of the municipalities or communities in the vicinity of Route 57 are specially benefited by the construction of this subway crossing, and no evidence was offered of any reason why they should pay any part of the cost of it. The State has undertaken the construction of the road, and no county, municipality or other public authority may be required to pay any part of the cost of construction. There was no defect of parties. The appellees are exercising franchises granted to them by the State under which they maintain their railroads, exercise their rights and privileges and hold and use their property, subject to such regulation of its use as the State, in the exercise of the police power for the public safety, health and welfare, may impose. Under the act of March 31, 1874, in relation to fencing and operating railroads, railroad corporations in this State are required to construct and maintain all railroad crossings of highways, and the approaches thereto, within their respective rights of way, so that at all times they shall be safe as to persons and property. The fact that the State has undertaken the construction of the roads included in its State-wide system of hard-surfaced roads does not relieve the railroad companies in the State of the performance of the duty of keeping the highway crossings of their roads,

and the approaches thereto, within their respective rights of way, safe as to persons and property. Section 58 of the Public Utilities act imposes on the Commerce Commission the duty, in case of a new crossing of the tracks of any railroad by a public highway, of prescribing the proportion of the expense which shall be divided between the railroad company and the State, county, municipality or other public authority in interest.

The appellees contend that under the provisions of the Motor Fuel Tax law (Laws of 1929, p. 625,) all expense of the separation of grades of State highways with railroads is to be paid out of the motor fuel tax fund and no part of such expense is to be assessed against railroads. Section 1 of the act of 1923 (Smith's Stat. 1931, chap. 121, par. 281a,) provides for the issuance of one hundred million dollars of bonds for the purpose of providing for the payment of the cost of the construction of the system of roads to be built under that act. Section 58 of chapter 111⅔ (Smith's Stat. 1931, p. 2266,) makes provision with regard to the division of costs "between the railroad or street railroad companies affected, or between such companies and the State, county, municipality or other public authority in interest," etc. Section 11 (par. 427) of the Motor Fuel Tax act provides that "the amounts apportioned to the Department of Public Works and Buildings shall be used for:

"The construction, reconstruction and maintenance of State bond issue roads, Federal aid roads, State highways in cities, towns and villages and State highway belt-line roads; and

"The separation of the grades of said State highways with railroads and with highways and where necessary in the judgment of the Department of Public Works and Buildings to provide adequately for traffic needs, the widening and improving of said State highways."

There is no conflict between section 58 of the Public Utilities act and section 11 of the Motor Fuel Tax act.

Section 11 of the Motor Fuel Tax act merely provides how the Department may use its proportion of the gas tax fund. It does not by express words or by implication purport to provide that there shall be no division of costs between railroad companies and the State or other public authorities interested.

The judgment of the superior court is reversed and the cause remanded to that court, with directions to enter a judgment in the cause in conformity with the views expressed in this opinion.

*Reversed and remanded, with directions.*

Mr. JUSTICE SHAW, dissenting:

I cannot concur in that part of the opinion which apportions the cost of the proposed grade separation on the basis of sixty per cent thereof to the State of Illinois and forty per cent to the railroad companies. It appears to me that the record is entirely insufficient to justify this division of expense or any other apportionment of the cost. There is no finding of fact in the order of the Commerce Commission which can give any basis, other than an arbitrary one, for that part of its order. In order to make that point perfectly clear it is necessary to state the entire finding of facts, copied directly from the order of the commission, which is admittedly the only basis for its order which follows. This finding of facts is as follows:

"The commission having given due consideration to the said petition and to the evidence introduced at the hearings held in the matter, and being full advised in the premises, is of the opinion and finds:

"(*a*) That petitioner herein is authorized by law to lay out and construct State Bond Issue Route 57, a State highway which is to extend between certain designated points and to provide certain cities and villages reasonable connections with each other, as hereinabove described;

"(*b*) That said Route 57, as laid out, extends across the tracks and rights of way of the respondent railroad companies by means of proposed under-crossings at certain points in the village of Niles Center, Cook county, Illinois, at the locations and in the manner shown on the plans attached to the petition in this case;

"(*c*) That certain portions of said Route 57, both north and south of the points of crossing herein proposed, have been constructed, the pavement on the constructed portions being forty feet (40') wide, the total width of said highway being one hundred feet (100'), and the said highway having been planned with the ultimate view of constructing the pavement to a total width of eighty feet (80');

"(*d*) That the line of the Chicago and Northwestern Railway Company herein concerned is the more westerly one of its two railroads extending between the cities of Chicago, Illinois, and Milwaukee, Wisconsin, over the double tracks of which railroad a heavy freight traffic is handled, and over which, also, a certain amount of rather high-speed passenger business is handled, the said line being located as hereinabove described and as shown on the plans attached to the petition in this case;

"(*e*) That the line of the Chicago North Shore and Milwaukee Railroad Company herein concerned is a double-track electrically-operated railroad known as the said company's Skokie Valley line, over the tracks of which railroad, on that portion of the same on which the proposed crossing is located, more than three hundred (300) trains are operated daily, some of which move at a high rate of speed, and which railroad extends between certain points and through certain communities, as hereinabove described and as shown on the plans attached to the petition in this case;

"(*f*) That due to the heavy traffic that doubtlessly will develop on said Route 57 and which will move thereover, (due to the direct alignment, easy curvature, wide right of

way and wide pavement of said highway,) the grades should be separated at the intersections of said highway with respondents' railroads;

"(*g*) That in the interest of public safety and convenience petitioner herein should be authorized to extend the said highway underneath respondents' tracks by means of double 14′ x 44′ openings and across their respective rights of way as prayed for by petitioner herein and as shown on the plans attached to the petition in this case, the right according to law to cross respondents' rights of way first having been secured and the said highway first having been legally opened up on both sides of respondents' railroads at the crossing locations before the work of such extension is started;

"(*h*) That petitioner herein should be required to perform the work of excavation of the said subway and the approaches thereto, also the work pertaining to the necessary drainage for said subways, and should at its sole expense construct the pavement on the said approaches and throughout said subways, and should be required thereafter, at its sole expense, to maintain the work which it constructs;

"(*i*) That the Chicago and Northwestern Railway Company should be required to construct the substructure and superstructure of the bridge required to support its tracks at the proposed crossing on its railroad, and should be required thereafter, at its sole expense, to maintain such structures;

"(*j*) That the Chicago North Shore and Milwaukee Railroad Company should be required to construct the substructures and superstructures of the bridge required to support its tracks at the proposed crossing on its railroad, said substructures to provide for four-track construction and said superstructure to provide for two-track construction, and should be required thereafter, at its sole expense, to maintain the said structures; also that said respondent should be required to construct the substructures and super-

structures of the bridge necessary to carry its yard tracks (existing or proposed), such structures to be of such track-carrying capacity as said respondent may elect to have constructed at the time said highway is constructed, and should be required thereafter, at its sole expense, to maintain the same;

"(*k*) That petitioner herein should be required to bear sixty (60) per cent of the total expense incurred in the construction of the proposed under-crossings, the highway pavement not being considered a part of the expense of such construction;

"(*l*) That the Chicago and Northwestern Railway Company should be required to pay forty (40) per cent of the total expense incurred in the construction of the proposed subway under its tracks and the approaches thereto, and necessary gutters, and twenty (20) per cent of the total drainage expense incurred in the crossing of both of respondents' railroads;

"(*m*) That the Chicago North Shore and Milwaukee Railroad Company should be required to bear forty (40) per cent of the total expense of the proposed subways under its tracks and the approaches thereto, and necessary gutters, and twenty (20) per cent of the total drainage expense incurred in the crossings of both of the respondents' railroads with said Bond Issue Route 57; and

"(*n*) That the prayer of the petitioner should be granted.

"It is therefore ordered," etc.

It is impossible for me to say from a reading of these findings that there is anything in them from which I can determine whether the railroads should pay forty per cent, ten per cent, or any other per cent of the cost of the proposed improvement. Surely they give us no light on such vital points as what, if anything, the railroads might save through a decrease in wear and tear on their surface crossings, through a decrease in expense of watchmen, signals,

etc., at such crossings, through a decreased liability for injuries which might occur at those crossings, or any other basic fact which might possibly serve as some guide to a just apportionment. The order as it stands could just as well and just as reasonably have required the railroads to pay ninety per cent or ten per cent of the amount involved as to arrive at the figures mentioned in the order.

It has been a rule in this court, supported by an unbroken line of authorities, that the Commerce Commission is required by section 65 of the Public Utilities act (Cahill's Stat. 1931, par. 84,) to make findings of fact sufficiently specific to enable this court to intelligently review its decisions. The majority opinion in this case appears to me to go contrary to this line of cases without mentioning them and without overruling them. Among these cases will be found the following: *Chicago, Rock Island and Pacific Railway Co.* v. *Commerce Com.* 346 Ill. 412; *Kewanee and Galva Railway Co.* v. *Commerce Com.* 340 id. 266; *Central Business Men's Ass'n* v. *Commerce Com.* 337 id. 149; *Louisville and Nashville Railroad Co.* v. *Commerce Com.* 353 id. 375.

I am also of the opinion that this order of the Commerce Commission violates the due process and equal protection clauses of the constitution of the United States, but since this point has not been discussed in the majority opinion I will not discuss it here.

It is my opinion that the order should have been reversed and the cause remanded to the Commerce Commission, with directions that it comply with section 65 above mentioned.

Mr. JUSTICE DEYOUNG concurs in this dissenting opinion.